IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THE HANOVER INS. CO.,

                     Plaintiff,                   OPINION AND ORDER

     v.

                                                     18-cv-325-wmc

BMOC, INC., WILLIAM J. LEVY,
and STEVE SAFFIAN,

                     Defendants.

In this declaratory judgment action, plaintiff Hanover Insurance Company seeks to establish that it is not obligated to provide a defense to its insured, BMOC, Levy and Saffian, in an ongoing lawsuit filed in the in the United States District Court for the District of New Jersey. That lawsuit was filed by a Bondholder Committee, on behalf of the Quad Cities Regional Economic Development Authority First Mortgage Revenue Bonds Series 2013A owners (the "Bondholder Lawsuit"). Presently before the court is Hanover's motion for judgment on the pleadings, contending that BMOC's liability insurance policy either does not cover or otherwise excludes coverage for the Bondholder Lawsuit. (Dkt. #23.) Because the relevant language in that policy unambiguously exludes coverage for the claims against defendants in the Bondholder Lawsuit, plaintiff's motion will be granted.

## BACKGROUND[1]

Hanover issued policy number LHI A861386 01 (the "Policy") to BMOC, Inc., in Madison, Wisconsin, providing Miscellaneous Professional Liability Insurance from February 20, 2017, until February 20, 2018. Hanover is incorporated under the laws of New Hampshire and has its principal place of business in Massachusetts; it is authorized to write liability insurance policies in Wisconsin. BMOC is a Wisconsin corporation with its principal place of business in Madison, Wisconsin. William J. Levy is BMOC's president, while Steve Saffian served as BMOC's "residential life liaison" and Sauk Valley Student Housing LLC's executive director. Both individual plaintiffs also reside in Wisconsin. Among other things, BMOC served as the property manager of a student housing project at an Illinois college.

On September 21, 2017, the Bondholders filed suit against BMOC, Levy and Saffian, along with other defendants in the New Jersey District Court. Levy was sued in his capacities as BMOC's president and a member of its management team, while Saffian was sued in his capacities as BMOC's residential life liaison and a member of its management team, as well as in his capacities as the executive director of both Sauk LLC and United Housing. Hanover agreed to defend defendants on October 26, 2017, under a reservation of rights.

---

[1] These background facts are taken from the pleadings in this case. Other pertinent facts discussed below are derived from the pleadings, the relevant insurance policy itself and the complaint in the underlying New Jersey litigation. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes.").

OPINION

Under Rule 12(c), "a party may move for judgment on the pleadings" once "the pleadings are closed -- but early enough not to delay trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is reviewed under the same standard as Rule 12(b)(6), except that the court considers all pleadings, as well as documents that are incorporated into any pleading by reference. *See Gill v. City of Milwaukee*, 850 F.3d 335, 339 (7th Cir. 2017) ("A motion for judgment on the pleadings is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." (citing *Buchanan-Moore v. City of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)). To succeed on a motion for judgment on the pleadings, "the moving party must demonstrate that there are no material issues of fact to be resolved," even with the court viewing all facts in the light most favorable to the nonmoving party. *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998).

I. **Plaintiff's Request for Judgment on the Pleadings**

A. **Standard**

Insurance policies, like other contracts, are interpreted to effectuate the contracting parties' intent. *Water Well Sols. Serv. Grp., Inc. v. Consolidated Ins. Co.*, 2016 WI 54, ¶ 14, 369 Wis.2d 607, 881 N.W.2d 285 (citing *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis.2d 16, 673 N.W.2d 65). The court interprets the policy's terms "as a reasonable person in the position of the insured would understand the language." *Id.* (citing *Estate of Sustache v. Am. Fam. Mut. Ins. Co.*, 2008 WI 87, ¶ 19, 311 Wis.2d 548, 751 N.W.2d 845). An "insurer has a duty to defend when the allegations, if proven, give rise

3

to the possibility of recovery under the terms of the policy." *Air Eng'g, Inc. v. Industrial Air Power, LLC*, 2013 WI App 18, ¶ 10, 346 Wis.2d 9, 828 N.W.2d 565 (citing *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 93, 261 Wis.2d 4, ¶ 19, 660 N.W.2d 666).

In assessing coverage, the court "compare[s] the four corners of the underlying complaint to the terms of the entire insurance policy." *Water Well Sols.*, 2016 WI 54, ¶ 14 (internal citations omitted). In so doing, the court "must liberally construe the allegations contained in the underlying complaint, assume all reasonable inferences from the allegations made in the complaint, and resolve any ambiguity in the policy terms in favor of the insured." *Id.* at ¶ 15 (citing *Sustache*, 311 Wis.2d 548, ¶ 21).[2] Moreover, "[t]he legal label applied to the claim is not determinative; what matters is whether the conduct alleged in the complaint is arguably within a category of wrongdoing covered by the policy." *Air Eng'g*, 2013 WI App 18 ¶ 10 (citing *Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119, 1122 (7th Cir. 1994)). Finally, if the insurance policy provides coverage for one claim in the underlying suit, then the insurer must defend all claims alleged. *Water Well Sols.*, 2016 WI 54, ¶ 16 (citing *Fireman's Fund*, 2003 WI 93, ¶ 21). This is true, even if the allegations are entirely baseless. *Pumpkin, Inc. v. Ryan*, 2014 WI App 83, ¶ 7, 355 Wis.2d 578, 851 N.W.2d 471 (quoting *Olson v. Farrar*, 2012 WI 3, ¶ 29, 338 Wis.2d 215, 809 N.W.2d 1); *see Marks v. Houston Cas. Co.*, 2016 WI 53, ¶ 39, 369 Wis.2d 547, 881 N.W.2d 309 ("[W]hen a complaint alleges facts that, if proven, would

---

[2] "A liberal construction of the complaint does not mean the court should imagine facts not even loosely pled by the plaintiff. Instead, a reasonable inference is a conclusion reached on the basis of evidence and reasoning, not imagination or speculation." *Water Well Sols.*, 2016 WI 54, ¶ 38 (citing *Inference The American Heritage Dictionary of the English Language* 899 (5th ed. 2011)).

4

constitute a covered claim, the insurer must appoint defense counsel for its insured without looking beyond the complaint's four corners." (quoting *Sustache*, 311 Wis.2d, 548 ¶ 27)).

The underlying complaint and the insurance policy are the only documents relevant to the coverage analysis. *Marks*, 2016 WI 53, ¶ 39 (citing *Fireman's Fund*, 2003 WI 33, ¶ 19). The court first decides if the insurance policy language covers the complaint's allegations. *Water Well Sols.*, 2016 WI 54, ¶ 16 (citing *Sustache*, 311 Wis.2d 548, ¶ 22). If not, that is the end of the inquiry, and the insurer has no duty to defend. *Id.* (citing *Sustache*, 311 Wis.2d 548, ¶ 22). On the other hand, if the allegations fall within the policy's coverage grant, then the court must determine whether a policy exclusion precludes coverage. *Id.* (citing *Sustache*, 311 Wis.2d 548, ¶ 23). If no exclusion applies to preclude coverage, then the insurer has a duty to defend. Finally, even if exclusions apply, the insurer may still have a duty to defend if "an exception to the exclusion applies to restore coverage."[3] *Id.* (citing *Sustache*, 311 Wis.2d 548, ¶ 23). If not, then the insurer has no duty to defend. *Id.* (citing *Am. Girl, Inc.*, 268 Wis.2d 16, ¶ 24).

A court interpreting an insurance policy exclusion presumes that a reasonable insured understands that the exclusion limits coverage; however, if the exclusion is ambiguous, "it will be construed in favor of coverage." *Phillips*, 2013 WI 105, ¶ 15 (citations omitted). Similarly, exclusions are "narrowly construed against the insurer." *Lexington Ins. Co. v. Tudor Ins. Co.*, No. 11-C-809, 2013 WL 461279, at *5 (E.D. Wis. Feb.

---

[3] If one exclusion precludes coverage without an exception, whether another exclusion applies becomes irrelevant. *See Water Well Sols.*, 2016 WI 54, ¶ 33 ("When one exclusion applies to preclude coverage, the inapplicability of another exclusion does not restore coverage." (citing *Am. Girl, Inc.*, 268 Wis.2d 16, ¶ 24)); *Phillips v. Parmalee*, 2013 WI 105, ¶ 35 n.15, 351 Wis.2d 758, 840 N.W.2d 713.

5

6, 2013) (citing *Day v. Allstate Indem. Co.*, 332 Wis.2d 571, 798 N.W.2d 199, 206 (Wis. 2011)). At the same time, an exclusion's exception cannot create coverage that does not exist under the policy's initial coverage grant. *Wadzinski v. Auto-Owners Ins. Co.*, 2012 WI 75, ¶ 15, 342 Wis.2d 311, 818 N.W.2d 819.

B. The Policy

The Policy at issue here covers "damages and claim expenses because of any claim made against [the insured] arising from a wrongful act in the rendering or failure to render professional services by [the insured]." (Policy (dkt. #20-2) 4 (emphasis removed).[4]) Under the policy, a "wrongful act" is "any actual or alleged negligent act, error, omission, or misstatement committed in [the insured's] professional services." (*Id.* at 8.) The "professional services" covered are "Property Management Services to Others for a fee." (*Id.* at 1.) Under the policy the "insured" included "[t]he named insured," as well as a corporate "officer, director, trustee or employee . . . acting on [the corporate insured's] behalf in such capacity." (*Id.* at 7.)

The policy also grants Hanover "the exclusive right to defend any claim made under this policy, even if the allegations are groundless, false or fraudulent until there is a final adjudication against [the insured]." (*Id.* at 5.) However, it warns that "[i]f a claim is not covered under this policy, we will have no duty to defend it." (*Id.*)

As is typical, the policy includes a number of exclusions, detailing what is not covered. These include in relevant part:

---

[4] Emphasis has been removed from all quotations of the Insurance Policy, unless otherwise noted.

6

| Policy Provision | Exclusion |
|---|---|
| Exclusion 7 | Claims "[a]rising out of:<br>a) Any purchase, sale, or offer or solicitation of an offer to purchase or sell securities;<br>b) Any violation of any securities law, including the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or any regulation promulgated under the foregoing statutes, or any federal, state or local laws similar to the foregoing statutes (including 'Blue Sky' laws), whether such law is statutory, regulatory or common law[.]"<br>(Policy (dkt. #20-2) 9.) |
| Exclusion 11 | Claims "[a]rising out of false advertising, misrepresentation in advertising, antitrust, unfair competition, restraint of trade, unfair or deceptive business practices, including but not limited to, violations of any local, state or federal consumer protection laws[.]" (*Id.*) |
| Exclusion 16 | "Any failure to effect or maintain, in the whole or part, any policy of insurance or reinsurance, any bond, or any decision or advise regarding the type or amount of insurance, reinsurance, or bond to purchase or perils to cover." (*Id.* at 23.) |
| Specified Professional Services Endorsement: | Claims "arising directly or indirectly out of the rendering of or failure to render any of the following professional services, advice or instruction by you on your behalf, or from whom the insured assumed liability by reason of a contract or agreement, regardless of whether or not any such service, advice or instruction is ordinary to any insured's profession: any advising on the suitability or profitability of investment projects or real estate locations and/or markets[.]" (*Id.* at 18.) |
| Exclusion -- Financial Consultants | Claims "[b]ased upon, arising out of or in any way relating directly or indirectly to:<br>* * *<br>d) The failure of investments to perform as expected or desired;<br>* * *<br>f) The preparation of pro-forma statements which are the basis of or are used with third parties for the purpose of securing capital through debt, equity, credit, or other means[.]" |

7

| | |
|---|---|
| | (*Id.* at 20.) |
| Exclusion -- Management Consultants | Claims "[b]ased upon arising out of or in any way relating directly or indirectly to:<br>* * *<br>    d) The failure of investments to perform as expected or desired;<br>    e) Making guarantees or warranties of potential sales, earnings, profitability, or economic value;<br>    f) The failure to secure financing;<br>    g) The preparation of pro-forma statements which are the basis of or are used with third parties for the purpose of securing capital through debt, equity, credit, or other means;<br>    h) The actual or alleged inaccurate, inadequate, or incomplete description or the price of goods, products, or services; or as a result of your cost guarantees, cost representations, contract price, pricing guarantees or estimates of probable costs or cost estimates being exceeded[.]"<br>(*Id.* at 21.) |

## C. The Bondholder Lawsuit[5]

According to the Bondholders, "BMOC provided student housing management services for the Project," which refers to Sauk LLC's undertaking "to acquire, construct and equip a 48-unit facility for student housing adjacent to [Sauk Valley Community] College." (Bondholders Amend. Compl. (dkt. #20-3) ¶¶ 35, 56.) BMOC and Levy allegedly "provided information regarding the Project's management, occupancy, costs and expenses of operation and future rents to the Feasibility Consultant," who then prepared a Feasibility Study in July 2013. (*Id.* at ¶¶ 62-63, 94.) This information was based on "an over 70% occupancy rate[,] yet fails to disclose that the Project never attained a 70% paid

---

[5] The allegations described in this section are drawn from the Bondholders' amended complaint, unless otherwise noted. (*See generally*, Bondholders Amend. Compl. (dkt. #20-3).)

8

occupancy rate at any time." (*Id.* at ¶ 95; *see also id.* at ¶ 96.) Likewise, the offering documents did not disclose that BMOC and the College had an agreement for the Project to "house athletes at a discounted rate" and coaches "at no cost whatsoever." (*Id.* at ¶ 98.) Accordingly, the Bondholders allege, the offering documents' "disclosure regarding occupancy and debt service coverage . . . contained misleading information and omissions of material information" provided by BMOC and Levy. (*Id.* at ¶ 100.)

On October 16, 2013, allegedly based on information provided by the defendants, the underwriter made representations to employees of the broker/dealer that BMOC had an affiliation agreement and good relationship with the College, and that the rental units in the Project would be marketed to current and incoming students. (*Id.* at ¶ 75.) In early November 2013, BMOC and Sauk LLC also entered a Property Management Agreement. (*Id.* at ¶ 81.) BMOC also allegedly knew a closing-related certification falsely represented that "there were no inquiries or investigations pending or threatened that would question the power of Sauk LLC to operate the Project," when in fact "a troubled relationship [existed] between Sauk LLC and the College," including the College's threat to terminate the Affiliation Agreement. (*Id.* at ¶¶ 87-88.) Nevertheless, the bond closing went forward on November 7, 2013. (*Id.* at ¶ 83.)

After the closing, the broker/dealer requested information from defendants BMOC, Levy, Saffian, and others, and received financial information from BMOC on September 9 and 30, and October 30, 2014, and February 17, and August 1, 2015. Even so, BMOC, Levy and Saffian "never provided Financial Statements to the Trustee as required." (*Id.* at ¶¶ 109-11, 129.) During a telephone conference in late October 2015, the College's

9

attorney Tony Miller informed the broker/dealer that "the College had a long history of problems with the Project," including "[p]ossible sexual exploitation by BMOC personnel of female students at the College," and "poor management." (*Id.* at ¶ 147.) During this call, the broker/dealer learned that the College provided sewer and water service to the Project, something that Levy, Saffian and BMOC are also alleged to have known and recognized might influence the value of the Project. (*Id.* at ¶¶ 148-51.) Likewise, the Bondholders allege that BMOC and others "have so poisoned the relationship with the College that it is uncertain whether the College would continue to provide water and sewer services to any entity owning or operating the Project." (*Id.* at ¶ 152.) Attorney Miller provided more detail about the "history of the troubled relationship between the owners and management of the Project and the College" in a letter to the broker/dealer on December 4, 2015. (*Id.* at ¶ 158.) Nevertheless, "[o]n April 1, 2016, BMOC issued a report representing that its relationship with the College had 'never been better.'" (*Id.* at ¶ 163.)

Based on this alleged conduct, the Bondholders assert twenty-five claims against the various defendants in the underlying action. (*Id.* at 29-65.) As to the insureds here in particular, they allege that BMOC, Levy and Saffian: (1) breached their duty of loyalty to the Bondholders by providing false information or omitting material information and that the Bondholders relied on these representations or omissions (*see id.* at ¶¶ 170, 173, 175, 177, 181, 183-90); (2) engaged in fraud by intentionally making misrepresentations or omissions to mislead the Bondholders, who relied on them to their detriment (*see id.* at ¶¶ 194-97, 200-03); (3) violated the New Jersey Uniform Securities Act (*see id.* at ¶¶ 248-

10

49, 253-54); (4) breached the covenant of good faith and fair dealing (*see id.* at ¶¶ 258-61, 264-68); (5) made promises causing detrimental reliance (*see id.* at ¶¶ 271-75, 277-82); (6) were unjustly enriched (*see id.* at ¶¶ 285-87, 289-91); (7) intentionally violated the Securities Act of 1934 (*see id.* at ¶¶ 293-98, 300-05); (8) "agreed to a scheme to defraud the Bondholders into purchasing the Bonds based on false projections" and other misrepresentations and omissions (*see id.* at ¶¶ 334-40); and (9) violated the New Jersey Consumer Fraud Act by making misrepresentations and omitting material information (*see id.* at ¶¶ 351-54).[6] The Bondholders also seek to pierce the corporate veil to hold Levy and Saffian personally liable for their actions on behalf of BMOC. (*See id.* at ¶¶ 319-22.)

D. Analysis

While a coverage question typically begins with the four-corners analysis, if an exclusion "clearly bars coverage," the court "need not examine a potentially more difficult question of whether the policy under the 'four corners' rule grants coverage." *State v. GE-Milwaukee, LLC*, 2012 WI App 5, ¶ 7, 338 Wis.2d 349, 808 N.W.2d 734. That is the case here. Indeed, a number of exclusions clearly bar the Bondholder Lawsuit. First, Exclusion 7 removes from coverage any claim "[a]rising out of" the "purchase, sale or offer . . . to purchase or sell securities" as well as the "violation of any securities law." (Policy (dkt. #20-2) 9.) Second, Exclusion 11 precludes coverage for claims "[a]rising out of . . . violations of . . . consumer protection laws." (*Id.*) Third, the Management and Financial

---

[6] It is unclear whether the Bondholders are also asserting a Consumer Fraud Act claim against Saffian, as most of the claim concerns Levy and BMOC, but Saffian is included in the "wherefore" clause. (*See id.* at 65-67.)

11

Consultants Exclusions exempt claims "[b]ased upon, arising out of or in any way relating directly or indirectly to" both: (1) "[t]he failure of investments to perform as expected or desired"'; and (2) "[t]he preparation of pro-forma statements which are the basis of or are used with third parties for the purpose of securing capital." (*Id.* at 20-21.)

As noted previously, exclusions are narrowly construed against the insurer and ambiguity will be construed in favor of coverage. *Lexington Ins. Co.*, 2013 WL 461279, at *5. There is no ambiguity in applying the exclusions here. Rather, each is straightforward and easily understood by a reasonable insured. Likewise, a reasonable insured would understand that they applied to the claims raised by the Bondholders, which generally allege that: (1) these defendants made material misrepresentations and omitted material facts associated with the offering of bonds; and (2) the Bondholders relied on that information to their detriment. As such, all of their claims plainly "aris[e] out of" the offer and sale of the Bonds, and related violations of securities laws, and consumer protection laws. *See id.* ("Arising out of," when found in a liability insurance policy, means "originating from, growing out of, or flowing from." (quoting *Lawver v. Boling*, 71 Wis.2d 408, 238 N.W.2d 514, 518 (Wis. 1976))); *Phillips*, 2013 WI 105, ¶ 24 ("The words 'arising out of' used in an automobile liability insurance policy 'are commonly understood to mean originating from, growing out of, or flowing from, and require that there be some causal relationship between the injury and the risk for which coverage is provided.'" (quoting *Lawver*, 71 Wis.2d at 415)); *cf. id.* at ¶ 25 (explaining that exclusion for loss "arising out of, resulting from, caused by, or contributed to in whole or in part by asbestos" required "some type of causal relationship between asbestos and the loss" (citation

omitted)).

While defendants argue that there are allegations relating to improper property management, separate and unrelated to the sale of securities (*see* BMOC & Levy's Opp'n (dkt. #25) 15-16), those fleeting allegations are not enough to change the character of the complaint. In particular, the Bondholders' allegations of poor management are not a distinct legal claim for liability, but rather are part of the alleged pattern of misrepresentations and omissions regarding defendants' anticipated operation and management of the Project, and past relationship with the College, that induced bond purchases by the Bondholders. Said another way, the Bondholders' "operative complaint -- root and branch -- alleges" that defendants were dishonest about their operation and mismanagement of the Project, harming the Bondholders. *GE-Milwaukee*, 2012 WI App 5, ¶ 14. "Thus, all the claims . . . either 'arise out of' or were 'contributed to' by the 'dishonest [or] fraudulent . . . act[s] or omission[s]' specified in the operative complaint." *Id*.; *cf. Connecticut Indem. Co. v. DER Travel Serv., Inc.*, 328 F.3d 347, 350-51 (7th Cir. 2003) (concluding that underlying complaint was "barren of any mention of negligence, inadvertence, error, or mistake, or anything even implying such conduct" because it only alleged that DER had "deceived, schemed, and defrauded consumers," adding that "it is the actual complaint, not some hypothetical version, that must be

considered" under Illinois law).[7]

Even assuming that the allegations about "failing to properly manage the Project to the detriment of the Bondholders" formed the basis of separate claims, they would still be excluded from coverage under the Management and Financial Consultants Exclusions because the claims would "aris[e] out of" or otherwise "relat[e] directly or indirectly to . . . [t]he failure of investments to perform as expected or desired," since unlike the owner of the property, the Bondholders' injury is in the decline in the value of the bonds. (*See* Policy (dkt. #20-2) 20-21.)

As the parties agree, "an insurer's duty to defend its insured is broader than its duty to indemnify." *Water Well Sols.*, 2016 WI 53, ¶ 17 (citing *Olson v. Farrar*, 2012 WI 3, ¶ 27, 338 Wis.2d 215, 809 N.W.2d 1). An insurer must defend if it *could* be required to indemnify, even if the insured is not ultimately found liable. *See id.* Since Hanover has no duty to defend, it also has no duty to indemnify. Accordingly, Hanover's motion for judgment on the pleadings will be granted.

## II. Defense Costs

In opposition to Hanover's motion, defendants separately argue that, even if Hanover has no duty to defend, Hanover has no right to recoup defense expenditures it

---

[7] Contrary to defendants' assertion, their claim to coverage is not saved to the extent that some factual allegations go to BMOC's poor management itself -- as opposed to misrepresentations or omissions about that poor management. First, as set forth above, plaintiffs are not asserting any claims based on a failure to perform. The closest a to covered claim are counts one and two for breach of a fiduciary duty. (*See* Bondholders Amend. Compl. (dkt. #20-3) ¶¶ 168-92.) But in the case of each defendant, the source of liability derives not just from a failure to "properly manage the Project" but again, by allegedly providing false information or omitting material facts. Second, the Bondholders would not have standing to bring such a claim.

has already incurred, because the Policy does not expressly permit the insurer to seek reimbursement. (Levy & BMOC Opp'n (dkt. #25) 21-23; Saffian Opp'n (dkt. #27) 2-3.) Having thrown down the gauntlet, plaintiff unsurprisingly enough picks it up, arguing that it *is* so entitled to reimbursement because otherwise defendants would be unjustly enriched. (Hanover Reply (dkt. #28) 21-22.) The parties agree that whether an insurance company can seek reimbursement for defense costs for claims outside the policy coverage is an open question under Wisconsin law. (*See id.* at 21 (acknowledging "this area of law in Wisconsin is unsettled"); BMOC & Levy Opp'n (dkt. #25) 21 (acknowledging that "Wisconsin courts have not squarely addressed this issue").) *See Sentry Ins. a Mut. Ins. Co. v. Regal Ware, Inc.*, No. 10-cv-168-wmc, 2012 WL 1088585 (W.D. Wis. Mar. 30, 2012) (recognizing open question). Although conceding it remains an open question, plaintiff cites to *Kreuger Int'l, Inc. v. Fed. Ins. Co.*, 647 F. Supp. 2d 1024 (E.D. Wis. 2008), which after addressing the unsettled state of Wisconsin law and reviewing different approaches, granted a request to file an amended counterclaim because the request for reimbursement was "not frivolous" and amendment "would not be futile." *Id.* at 1045. While the court noted that the insurance company "may be entitled to reimbursement of the defense costs it paid under its reservation of rights," the court declined to address that issue until after the matter had been fully briefed. *Id.* at 1027, 1045. The court never addressed the question, as the parties ultimately stipulated to dismissal without the court revisiting the issue. *See Krueger Int'l*, No. 1:07-cv-00736-WCG Docket.

There is no dispute that Hanover accepted the tendered defense under a reservation of rights. (*See* Amend. Compl. (dkt. #20) ¶ 52; BMOC & Levy Amend. Ans. (dkt. #22)

15

¶ 52; Saffian Amend. Ans. (dkt. #21) ¶ 52.) However, there can be no dispute that the Policy provides for no reimbursement of defense costs undertaken under a reservation of rights,[8] nor did Hanover even put defendants on notice that it might seek reimbursement. Accordingly, Hanover is not clearly entitled to recoup the money already spent on defense under contract. While admittedly Wisconsin law functions to coerce insurance companies into defending until a court adjudicates the duty to defend, that is generally a cost of doing business. If Hanover had wanted to ensure that it could recoup preliminary defense costs, it should have written the policy to provide that option, or at least sought an emergency adjudication of its obligation in the New Jersey District Court.[9] Accordingly, as addressed above the court will grant Hanover's motion for judgment on the pleadings, but will not require defendants to reimburse defense costs incurred to date by the plaintiff.

ORDER

IT IS ORDERED that:

1) Plaintiff's motion for judgment on the pleadings (dkt. #23) is GRANTED. Accordingly, plaintiff Hanover Insurance Company is not obligated to defend or indemnify the defendants in the underlying Bondholder Lawsuit.

---

[8] The only reimbursement addressed in the Policy concerns Hanover's payment of the deductible. (Policy (dkt. #20-2) 5.)

[9] Frankly, this court is not typically sympathetic to accelerating the resolution of coverage issues over the orderly progress of the underlying lawsuit itself, but perhaps the New Jersey court might have been more sympathetic. Regardless, this is the onus generally put on insurance companies under Wisconsin law. *Water Well Sols.*, 2016 WI 54, ¶ 27 ("strongly encourag[ing] insurers to follow one of the judicially-preferred approaches" -- requesting a bifurcated trial on coverage and seeking a stay of liability proceedings; providing coverage under a reservation of rights; or providing an initial defense and seeking a declaratory judgment on coverage). Having failed to seek a stay and early adjudication in New Jersey, the court is disinclined to award them here, especially without an express right to reimbursement of costs incurred in providing a defense under a reservation of rights set forth in the insurance contract itself.

2) Plaintiff is not entitled to recoup defense costs.

3) The clerk of court is directed to CLOSE this case.

Entered this 27th day of February, 2019.

                                  BY THE COURT:

                                  /s/
                                  _____
                                  WILLIAM M. CONLEY
                                  District Judge